FIRST NATIONAL BANK OF LOS ANGELES, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

LOS ANGELES TRUST & SAVINGS BANK, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 2817, 2818.    Promulgated April 15, 1927.

Deductibility of certain debts determined.

*William A. Bowen, Esq.*, for the petitioners.
*A. Calder Mackay, Esq.*, for the respondent.

These are proceedings for the redetermination of deficiencies in income and profits taxes for the calendar years 1920 and 1921, as follows:

First National Bank of Los Angeles:
  1920 _____ $19,000.82
  1921 _____ 51,759.73
Los Angeles Trust & Savings Bank, 1920 _____ 4,699.53

On motion of the petitioners the cases were consolidated for hearing and decision.

At the hearing of the appeals the petitioners withdrew from issue the following items:

### First National Bank of Los Angeles.

#### 1920.

Disallowance of $85,000 claimed as loss on notes of C. H. & O. B. Fuller Co. charged off.

Inclusion in income of $4,000 recovered on the account of N. B. Dotson.

Failure of petitioner to deduct the amount of $504.92 representing balance of account of J. N. Holloway.

Inclusion in income of $380.83 recovered on the account of the McStay Supply Co.

#### 1921.

Disallowance of $10,402.52 representing a partial charge-off of the indebtedness of Percy H. Clark.

Inclusion in income of $1,030.24 recovered on the account of the Fruit World Publishing Co.

Failure of petitioner to deduct from income $1,870.91 of the account of the McStay Supply Co.

Inclusion in income of $1,240 realized on sale of Corona Lemon Co. stock.

### Los Angeles Trust & Savings Bank.

#### 1921.

Disallowance of charge-off of note of V. K. Morgan in the amount of $5,500

The Commissioner, at the hearing, admitted the correctness of the claims of the petitioners as to the following items:

### First National Bank of Los Angeles.

#### 1920.

Deduction from income of $3,500 as a loss on the sale of real estate taken by the bank to secure the indebtedness of A. J. and H. R. Hamilton.

Deduction from income of $1,500 as a loss on the sale of real estate taken by the bank to secure the indebtedness of Gesner Williams.

#### 1921.

Deduction from profit realized on sale of real estate, taken under judgment against Baxter Todd, of the cost of maintaining the property in the amount of $2,153.68.

Deduction of loss on the sale of real estate in the amount of $2,000.

Deduction from income of $259.20 due to overstatement of profits and capitalizing expenses, by a revenue agent, on real estate acquired under judgment against C. W. Bowen and sold in 1921.

### Los Angeles Trust & Savings Bank.

#### 1920.

Deduction from income of expenses paid in the amount of $5,365.74, carried on the books of the bank as "Deferred expense."

The issues remaining are:

### As to First National Bank of Los Angeles.

Claimed erroneous inclusion in income for 1920 of proceeds of sale of Traders Oil Co. stock in the amount of $1,080, and loss on the sale of the stock in the amount of $540.

Disallowance by the Commissioner of notes of the Fontana Farms Co. in the amount of $21,200 charged off in 1921.

Disallowance of notes C. H. & O. B. Fuller Co. in the amount of $50,000 charged off in 1921.

Disallowance of balance of indebtedness of Sutherland Fruit Co. in the amount of $7,018.32 charged off in 1921.

### As to Los Angeles Trust & Savings Bank.

Disallowance of debt of Union Pipe Co. in the amount of $8,922.21 charged off in 1921.

#### FINDINGS OF FACT.

The First National Bank of Los Angeles is a National Banking Association. The Los Angeles Trust & Savings Bank, during the years 1920 and 1921, was a corporation organized under the laws of the State of California. Both petitioners have their principal places of business at Los Angeles, Calif.

The additional tax for 1920 was prorated among the two petitioners and another affiliated company. The additional tax for 1921 was determined against the petitioner First National Bank of Los Angeles.

In 1916 the First National Bank of Los Angeles held notes of Matheson, Inc., aggregating $35,400. During that year it charged off $17,400 of such notes and in payment of the balance of $18,000 accepted real estate at $10,980 and 108 shares of Traders Oil Co. stock at its then market value of $65 per share, or a total of $7,020. In 1917 it wrote down the value of this stock to $5,400 and claimed the difference of $1,620 as a deduction from its gross income in its income-tax return for that year. This claim was disallowed by the Commissioner. On July 28, 1920, it sold the stock for $6,480, sustaining a loss of $540. In entering the 1920 transaction in its records

it erroneously used as the cost the value of $5,400 and included a profit of $1,080 which it reported as income for that year.

In 1921 the petitioner First National Bank of Los Angeles held the following obligations of the Fontana Farms Co.: $37,500 in unsecured notes; $20,000 in trust notes; and $75,000 in bonds. In 1920 it charged off $16,300 of the unsecured notes and in 1921 charged off the balance in the amount of $21,200. These amounts the Commissioner disallowed. On January 12, 1922, following a reorganization of the Fontana Farms Co., the petitioner received preferred stock of that company of the par value of $95,000 in exchange for the notes it held aggregating $57,500 and for one-half, or $37,500, of the bonds. The petitioner still has the stock and no dividends have ever been paid on it.

The Fontana Farms Co. was attempting to develop and sell as orange property some six or seven thousand acres of land which it acquired about 1918 through a reorganization. In addition to land and buildings it held all the capital stock of the Fontana Lands Co. A consolidated balance sheet of the Fontana Farms Co. and the Fontana Lands Co. at December 31, 1921, was as follows:

| Assets. | Amount. | Liabilities. | Amount. |
|---|---|---|---|
| Land | $3,720,946.79 | Capital stock | $2,500,500.00 |
| Buildings and improvements | 189,292.29 | Bonded indebtedness | 1,084,000.00 |
| Machinery, equipment, and tools | 73,444.27 | Notes and accounts payable | 1,479,852.31 |
| Water and water rights | 60,280.00 | Surplus | 1,280,601.69 |
| Livestock | 111,975.68 | | |
| Supplies and crops | 66,950.81 | | |
| Notes and accounts receivable | 383,012.44 | | |
| Cash (overdraft) | 6,524.61 | | |
| Investments in other companies: | | | |
| Mutual Water & Power | 1,269,079.90 | | |
| Southern Livestock Co | 75,261.67 | | |
| Intangible (stock and bond discount) | 401,234.76 | | |
| Total | 6,344,954.00 | Total | 6,344,954.00 |

The value of the land includes the cost of planting, water, fertilizer, taxes and interest. The value of the land shown in the balance sheet is at least one-third greater than its actual value and the values shown for the other assets are considerably more than their true values.

About 1920 or early 1921 the financial situation of the Fontana companies became acute, and a committee of three representing the largest holders of the securities of the companies made an investigation of their affairs. Two of the three were officers of the petitioner companies. On February 16, 1921, the committee reported that, as the Fontana Farms Co. had defaulted in payment of interest on its bonds on February 1, and the Fontana Lands Co. would be unable to meet its bond interest payment on March 1 of that year, and as funds were required for taxes and operation of the properties, a

reorganization of the companies which would reduce interest-bearing securities was desirable. It recommended immediate action as it was apparent that both companies might be placed in the hands of receivers and proposed that the bondholders exchange their bonds for new bonds on the basis of 50 cents on the dollar and for preferred stock on the same basis, the new bonds and preferred stock to be issued by a new company. It also advised the bondholders of their privilege of exchanging their bonds for land of the companies in the event they did not desire to join in a reorganization. One creditor and bondholder that had about $600,000 in notes of the Fontana Companies and $780,000 in bonds, forgave the indebtedness on the notes, took land for the bonds and gave back to the companies a contract of sale thereof. Some other bondholders turned in their bonds for land having a market value of not more than 50 per cent of the par value of the bonds surrendered. The remaining creditors and bondholders, including the petitioner, agreed to and did join in the proposed reorganization, pursuant to which the petitioner received $95,000 in preferred stock, above mentioned. Under the reorganization plans the Fontana Companies retained a part of the authorized bond issue, and from time to time issued the bonds to creditors, including the petitioner, in exchange for funds advanced to meet carrying charges and operating costs. These expenses, in every year, have exceeded the income from the property.

The petitioner, First National Bank of Los Angeles, made loans to the C. H. & O. B. Fuller Co. and affiliated companies over a period of years. On December 31, 1921, such indebtedness to the bank was $1,075,551.11. On September 23, 1921, the bank charged off two items of this account in the amounts of $10,000 and $5,000. On December 22, 1921, it charged off two items in the amounts of $25,000 and $15,000, and on the same date restored the $5,000 item charged off in September, leaving a net amount of $50,000 of this account charged off during the year. No payments were made on this indebtedness in 1921. As collateral security for the Fuller indebtedness the bank held an assignment of credit of O. B. Fuller with the Fuller Co., chattel mortgages on live stock, deeds of trust on real estate, and corporate stocks in amounts as follows:

|  | Shares held. | Shares outstanding. |
|---|---|---|
| Pioneer Ranch, Inc | 499, 997 | 500, 000 |
| Flying V Cattle Co | 273, 329 | 500, 000 |
| Jalama Ranch & Cattle Co | 5, 276 | 5, 276 |

The credit assigned to the bank by O. B. Fuller represented a credit in the amount of $29,115.10 due him from the Fuller Co. on account of notes he had paid for the company in previous years. The Fuller Co. was unable to pay this amount in 1921 and it was of no value as security for the Fuller indebtedness.

The live stock on which the bank held chattel mortgages were cattle of the Flying V Cattle Co. and cattle of the Fuller Co. on the Jalama Ranch. There were two mortgages to the petitioner on the cattle of the Flying V Co., both given in 1921 to secure a note on which $145,000 was unpaid at December 31, 1921. The cattle were worth not over $150,000 and were subject to a prior mortgage to one Marley in the amount of $47,657.27. The mortgage on the Fuller cattle on the Jalama Ranch was given to secure a note on which $120,000 was unpaid at December 31, 1921. The cattle had a value equal to the amount of the mortgage.

The property on which the bank held deeds of trust consisted of real estate of the Pioneer Ranch, Inc., and of the Jalama Ranch Co. The trust deed on the Pioneer Ranch property was dated January 7, 1920, and was given to secure all the indebtedness of the Fuller Co. and C. H. Fuller and O. B. Fuller individually which they then owed or might owe the bank in the future. The property had a value in 1921 of $294,439 and was subject to a bond issue of $110,000. The trust deed on the Jalama property was dated November 1, 1921, and was given to secure a note of the same date in the amount of $90,000. The land of the Jalama Co. in 1921 had a value of $386,550, against which there were outstanding land purchase liabilities of $246,600.

The capital stock of the Pioneer Ranch, Inc., the Flying V Cattle Co., and the Jalama Ranch & Cattle Co., which the bank held, was of no value as security for the Fuller indebtedness as hereinafter shown.

Some of the Fuller Co. notes were indorsed by C. H. Fuller and O. B. Fuller individually and some were indorsed by them jointly. Both of the Fullers were insolvent in 1921.

The balance sheet of the C. H. and O. B. Fuller Co. at December 31, 1921, showed a deficit of $794,524.28, which included the operating loss sustained by the company in that year in the amount of $215,600.34. Deducting from this deficit the capital stock liability of $531,018.72 the balance sheet shows liabilities of $236,505.56 in excess of assets.

Included in the assets listed were the following:

| | |
|---|---|
| Cattle | $317,603.87 |
| Accounts receivable | 20,006.69 |
| Investment—Parker Ranch | 62,627.10 |

Investment—Stock, subsidiary corporations:

| | |
|---|---|
| Jalama Ranch & Cattle Co_____ | $327, 072. 39 |
| Flying V Cattle Co_____ | 62, 238. 38 |
| Willows Cattle Co_____ | 132, 953. 79 |

Advances to subsidiary corporations:

| | |
|---|---|
| Flying V Cattle Co_____ | 17, 104. 16 |
| Parker Cattle Co_____ | 116, 393. 82 |
| Willows Cattle Co_____ | 5, 820. 43 |

All of these assets were overstated in the balance sheet. The cattle listed at $317,603.87 had an actual value of less than half that amount. The greater part of the accounts receivable listed at $20,006.69 were worthless. At the close of 1921 the Parker Cattle Co. books showed assets of $3,500 and a deficit of $279,102.79; the Jalama Ranch & Cattle Co. balance sheet showed a surplus of $7,808.91, but this was due to overstating the value of lands of the company by at least $300,000; the Flying V Cattle Co. showed a deficit of $4,050.01 plus an operating loss for the year of $600, but the value of the cattle, its principal asset, stated at $310,020.13 was not in excess of $150,000, against which there was a mortgage in the amount of $47,657.27; the Willows Cattle Co. showed a deficit of $24,814.94 by attributing a value of $200,942.01 to its cattle which were not worth more than $20,000; the balance sheet of the Pioneer Ranch, Inc., showing a deficit of $261,090.34 included land at over $100,000 in excess of its fair market value. This condition was known to the petitioner in 1921 when it ascertained that more than $50,000 of the Fuller account was worthless.

On September 24, 1918, the petitioner, First National Bank of Los Angeles, charged off a note of the Sutherland Fruit Co. in the amount of $10,000. This was not allowed as a deduction by the Commissioner. In June, 1919, the Sutherland Fruit Co. paid $2,500 to apply on the principal of its indebtedness and gave a new note for the balance of $7,500, which the petitioner charged off in its loss and recovery ledger under date of June 17, 1919. On June 3, 1920, the Sutherland Fruit Co. was adjudicated a bankrupt. As a result of the bankruptcy proceedings the petitioner received a dividend of $226.16 on March 28, 1921, and a final dividend of $481.68 on October 7, 1921.

In 1921 one E. H. Adams, doing business under the fictitious name of Union Pipe Co. was indebted to the petitioner, Los Angeles Trust & Savings Bank, in the principal amount of $8,885.00. Of this account the petitioner charged off $8,584.51 under date of December 22, 1921. A revenue agent's report in evidence shows a disallowance of a charge-off against this account for the year 1921 in the amount of $8,922.21. The indebtedness was secured by a warehouse receipt covering secondhand pipe in storage. Following a marked decline

in the price of secondhand pipe in 1921 the bank, in December of that year, turned the account over to an employee for collection. The employee obtained in December, as additional security, a chattel mortgage on a small amount of pipe-cutting equipment and office furniture and an automobile. At that time there was an indebtedness against the automobile, apparently prior to that of the bank, in the amount of $1,500, on which payments were due at $175 per month. In view of this situation the bank was unable to realize anything on the automobile until in May, 1922, when Adams had reduced his indebtedness on it.

The employee in charge of this account was unable to locate any property of the debtor, other than that mentioned above against which the bank held evidences of indebtedness. He visited dealers in secondhand pipe in an effort to dispose of the pipe it had taken over but was unable to find any market for it.

During 1922 the bank disposed of the pipe through installations in new subdivisions under contracts whereby it guaranteed payment for the labor.

#### OPINION.

ARUNDELL: In 1920 the First National Bank sold 108 shares of stock of the Traders Oil Co. for $6,480. This stock had been acquired by the bank in settlement of a debt, at a cost of $7,020. Consequently, on the sale a loss of $540 was sustained, for which it is entitled to a deduction for the year 1920. Instead of claiming a loss on this transaction the bank erroneously reported a profit of $1,080 due to using an incorrect cost basis. The income should accordingly be reduced by the amount of $1,080, in addition to allowing the loss of $540.

The First National Bank claims a deduction of $21,200, representing unsecured notes of the Fontana Farms Co., charged off in 1921. The evidence shows that the Fontana Co. was in poor financial condition and that for a number of years its operating expenses had exceeded its income. In 1921 it effected a reorganization which enabled it to reduce its interest payments and to obtain funds from its security holders to meet its carrying charges and operating costs. Some of its bondholders deemed the securities of so little value that they surrendered their bonds for land having a market value of not more than 50 per cent of the face value of the bonds.

While the poor financial condition of the Fontana companies might at first glance indicate that the unsecured notes held by the petitioner were of little value, an analysis of the Fontana balance sheet set out in the findings of fact shows substantial assets in excess of the liabilities. The evidence shows the book value ascribed to the land to have been at least one-third greater than its true value.

Allowing for this over-valuation reduces the value of the land by $1,240,000 in round numbers, and serves merely to wipe out the greater part of the book surplus. The extent of the overvaluation of the other assets is not disclosed by the evidence, but even applying to all of them, including the land, a write-down of one-third of the book values, there remains a value of $4,229,970 which is $1,666,127.69 in excess of the total bonded indebtedness and notes and accounts payable. Taking this view of the case, the petitioner has failed to establish that any part of the Fontana notes were worthless at the close of 1921 and we must sustain the respondent in his refusal to allow the deduction claimed.

The loans by the First National Bank to C. H. & O. B. Fuller Co. and affiliated companies were secured mainly by capital stock and mortgages and trust deeds on property of corporations in which the Fullers were interested. As shown by the findings of fact, these securities in the aggregate were insufficient to secure the indebtedness for which they were held. All of the assets shown in the Fuller Co. balance sheet and the balance sheets of the other companies listed in the findings of fact were greatly overvalued. The indebtedness of the Fuller Co. to the petitioner constituted over 40 per cent of its liabilities exclusive of capital stock liability. Even if the balance sheet is taken as representing the true assets and liabilities, it works out that 40 per cent of the deficit, excluding capital stock liability, is $94,602, which, if established, is more than sufficient to warrant the allowance claimed. However, as set forth in the findings of fact, the excess of liabilities over assets was greater than shown by the balance sheet. The several companies had in fact no net worth and their stocks were of little value as security for the Fuller indebtedness. A true picture of the woeful lack of security for the Fuller indebtedness can best be shown by a summary which appears as follows:

| | | |
|---|---|---|
| Indebtedness | | $1,075,551.11 |
| Security. | Actual value. | |
| Assignment of credit | None. | |
| Flying V chattel mortgage | $102,342.73 | |
| Jalama chattel mortgage | 120,000.00 | |
| Pioneer trust deed | 184,439.00 | |
| Jalama trust deed | 140,050.00 | |
| Capital stock pledged | None. | |
| Fuller indorsements | None. | |
| Total value as security | | 546,831.73 |
| Deficiency in security | | 528,719.38 |

The officers of the bank were aware of this situation and at the close of 1921 had ascertained that the Fuller account was worthless to the extent of more than $50,000. Under section 234 (a) (5) of the

Revenue Act of 1921 a debt which is recoverable only in part may be charged off in part. It is not necessary under this provision, as it had been under the Revenue Act of 1918, to ascertain that a debt is worthless in whole in order to support a claim for deduction. In *Appeal of John E. Saddler*, 2 B. T. A. 1305, we had under consideration the partial charge off of an item under section 214(a) (7) which is identical with section 234(a)(5) of the 1921 Act. We said there,

The ascertainment of the worthlessness of a debt, either in whole or in part, is the exercise of sound business judgment based upon as complete information as is practicably obtainable.

In the case of *Stieglitz, Treiber Co.*, 1 B. T. A. 452, where the taxpayer's debtor was in financial difficulties and it was found that the debt at the close of the year could not be regarded " as reasonably worth more than 50 per cent of its face amount," the taxpayer was permitted a deduction of one-half the amount of the debt.

In view of the evidence we believe that the petitioner is entitled to a deduction in the amount of $50,000, the amount of the Fuller indebtedness that it charged off in 1921.

The petitioner, First National Bank, claims as a deduction for 1921 the amount of $7,018.32, representing the difference between a note of the Sutherland Fruit Co. for $7,500 and the amount of $481.68, which is the amount of the final liquidating dividend received in 1921 as the result of the bankruptcy of the debtor. The original indebtedness of the Sutherland Fruit Co. was $10,000. This amount was charged off in 1918 but was disallowed by the Commissioner as a deduction for that year. The bankruptcy of the Sutherland Fruit Co. and the receipt of a final dividend in 1921 constitute sufficient proof to permit the deduction of the balance of the account as a bad debt in 1921. The deduction allowable is the difference between $7,500 and the dividends of $226.16 and $481.68, received in 1921.

The last item for consideration is the claim of the Los Angeles Trust & Savings Bank for a deduction of $8,922.21 written off in 1921 as a bad debt of the Union Supply Co. The bank had as security for this account a warehouse receipt covering a quantity of secondhand pipe and before the close of 1921 secured a chattel mortgage on some pipe-cutting machines, office furniture, and an automobile. The bank took over the assets of the debtor and attempted, without success in 1921, to sell them in order to liquidate the indebtedness. While it appears that there was no ready market in 1921 for the property taken over from the Union Supply Co. we are not satisfied that the account was ascertained to be wholly worthless in 1921. As set out above, the Revenue Act of 1921 permits the charge-off of the portion of a debt which it is ascertained can not

be recovered, but in this case the evidence does not show to what extent the account had been ascertained to be uncollectible in 1921 and we can not say what portion of it may be allowed.

*Judgment will be entered on 15 days' notice, under Rule 50.*