PRODUCTION STEEL, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent.
Production Steel, Inc. v. Commissioner
Docket No. 2723-77.
United States Tax Court
T.C. Memo 1979-361; 1979 Tax Ct. Memo LEXIS 161; 39 T.C.M. (CCH) 77; T.C.M. (RIA) 79361; September 10, 1979, Filed *161 Petitioner sold goods on an open account to a customer which incurred an operating loss. This loss put the customer in default of its bank line of credit. Termination of this line of credit threatened to stop the customer's operations during a seasonal peak in its operating cycle. A creditors' committee, of which petitioner was a member, was formed which instituted certain changes in the customer's financial organization, thereby avoiding the permanent closing of customer. The customer returned to normal operations by the end of December 1971. However, petitioner deducted, as partially worthless under section 166(a)(2), I.R.C. 1954, 71 percent of its account with the customer. Respondent disallowed the deduction. Held, respondent's determination was not plainly arbitrary or unreasonable and is, therefore, sustained. James D. Leckrone, for the petitioner. Wm. Robert Pope, Jr., for the respondent. BRUCE MEMORANDUM FINDINGS OF FACT AND OPINION *162 BRUCE, Judge: Respondent determined deficiencies in the petitioner's Federal income taxes for the fiscal years ended (FYE) October 31, 1971 and FYE October 31, 1972, of $148,351.92 and $3,456.32, respectively, as set forth in his statutory notice of deficiency dated December 17, 1976. Due to concessions by petitioner, [1] the only issue remaining for our decision is whether a debt owed to petitioner was partially worthless and, thus, deductible under section 166(a)(2)[2] in the amount claimed by petitioner on its corporate income tax return for FYE October 31, 1971. *163 FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. Petitioner, Production Steel, Incorporated, is a Tennessee corporation founded in 1960 with its principal office in Nashville. For the year in issue, petitioner timely filed a Federal corporate income tax return with the Internal Revenue Service Center at Chamblee, Georgia, using the accrual method of accounting. Petitioner is a steel service center. In other words, petitioner first performs certain finishing operations on the steel mill product, and then processes the steel into various shapes and sizes as the initial step in the formation of the final product by its manufacturing customers. One of petitioner's customers is The Leisure Group, Inc. (hereafter TLG) which, in FYE October 31, 1971, was billed for sales in the total amount of $1,223,049.56. Payments on the account receivable became slower during the spring of 1971. On October 13 of that year, petitioner received an October 1 Dun & Bradstreet report that TLG had an operating loss of $3,700,000 for the nine months ending July 31, 1971. *164 This loss, later stated as $4,300,000 in the annual report of TLG for FYE October 31, 1971, placed TLG in default of its bank line of credit. As of October 31, 1971, the unpaid balance on TLG's account with petitioner was $434,649.50. As a result of the default on the bank line of credit, it was necessary for TLG to reduce its outstanding bank loans in August 1971. However, in doing so, TLG also reduced the amount of available operating cash during a peak in its seasonal business. Thus, all production was suspended by TLG for several weeks in September and October until other financing could be arranged. As anticipated by TLG management, the suspension of production was only temporary. After some financially necessary steps were taken, normal operations resumed by the end of December 1971. In an October 12, 1971 letter, the Credit Managers Association of Southern California, acting for TLG, notified all of the creditors of TLG, including petitioner, that a creditors' meeting would be held on October 20. At that meeting, the creditors were informed, according to a preliminary opinion of the management consultant firm of Worden and Risberg, that, after remedial action, TLG *165 would be a viable continuing entity. Further, the creditors learned that a liquidation of TLG might prove harmful to all of them, since all of the assets of TLG were subject to security interests of the banks. In light of this information, a creditors' committee was elected to cooperatively obtain maximum payment of all of TLG's unsecured trade creditors, as an alternative to Chapter X or XI proceedings under the Bankruptcy Act. Sidney T. Wright (hereafter Wright), president of petitioner since 1960, was elected to the committee. While the creditors' committee was in existence, petitioner continued to sell its products to TLG at a net profit two to three times that of the industry average. Petitioner shipped goods to TLG on an open account until September 20, 1971, and resumed shipments on an open account after May 19, 1972. For the intervening period from November 19, 1971, to May 19, 1972, all shipments to TLG by petitioner were on a cash in advance basis. During the entire period, total sales to TLG by the petitioner, which were paid, were as follows: Period
Amount
10/1/71 to 4/26/72 $ 665,211
4/28/72 to 5/16/72
109,428
5/19/72 to 3/1/73
409,772
Total
$1,184,411
*166 Meanwhile, the first problem of the committee was to find a way for TLG to obtain sufficient cash to survive as a viable entity. Otherwise, the unsecured creditors would be delayed in collecting on their debts, since all of the assets were already pledged as security for bank loans. For this reason, liquidation and bankruptcy were mentioned only in the negative context, as alternatives to be avoided, if at all possible. The vice president of finance for TLG echoed this sentiment in stating at the October 22 meeting of the creditors that it was TLG's desire to continue normal operations, except in two divisions which were to be sold in hopes of easing its financial problems. Negotiations for the sale of the Ben Pearson Division to the Brunswick Corporation had been conducted since before the first meeting of the creditors and seemed assured of success. The other sale, that of the Yard-Man Division to Montgomery Ward, was being discussed by the parties involved, but, because of possible corporate securities regulation violations, could not be disclosed prematurely to the creditors. Therefore, the status of this second sale was not known to the creditors until their meeting *167 on October 29, 1971. While progress had ben made in the negotiations as of October 31, 1971, the sale of the Yard-Man Division was not certain until after that date, due to disagreements on how the proceeds of the sale should be distributed. At the next creditors' committee meeting, November 1, 1971, the creditors learned that the banks regarded the sale of the Yard-Man Division to Montgomery Ward as a prerequisite to any other steps for resolving TLG's financial problems. Sales of both divisions were completed by the end of November 1971. Although most of the proceeds were used to reduce bank debt, the unsecured creditors were benefitted by the sales of the two divisions, as well. Upon closing of the Yard-Man sale, $1,500,000 was distributed to the creditors, $1,000,000 distributed to them upon closing of the Ben Pearson sale, and $1,000,000 distributed to them four months after the closing of the Yard-Man sale. Under the same arrangement, the banks agreed to furnish operational financing for TLG until November 1, 1972, and, in conjunction with certain unsubordinated debt and note holders, agreed to purchase all claims of unsecured Yard-Man creditors at 100 percent value. *168 As of October 31, 1971, prior to the sales of the two divisions, TLG's financial position was as follows: Assets
Current Assets
$ 32,636,175
Property, Plant & Equipment not only improved the net worth of TLG, but also would save TLG approximately $1,000,000 in each of the next two years. In light of the adjustments outlined above, the creditors' committee felt that TLG would make good its desire to pay all of its debts. While the committee anticipated a lengthy process, they felt, as early as November 17, 1971, that TLG was quite solvent and able to meet its debts as they matured. At a later meeting of the committee, December 8, 1971, an extension agreement with TLG was approved whereby TLG would pay either the balance of its trade bills remaining after the sale of the divisions at 7-3/4 percent interest beginning July 15, 1972, and continuing for four years, or 90 percent of the balance without interest by November 12, 1972. On May 4, 1973, TLG notified its creditors that it would settle any debt for one-third of the remaining balance. Under this offer, those creditors not accepting would waive any further distribution until after those settling were paid. Thereafter, remaining debts were to be paid in 36 equal installments. Petitioner elected to await full payment. However, the terms for full payment were changed, effective October 23, 1973, adding all accrued interest as of October 31, 1973, to principal, paying 7-3/4 percent interest on the principal from November 15, 1973, until paid, and extending the payment period to 84 months. Another offer to settle with the remaining creditors for approximately 32 percent of the debt balances was made by TLG on May 29, 1975. Petitioner elected to remain a creditor under the installment arrangement. The last payment under that arrangement was received August 2, 1976. Thereafter, TLG was unable to make the required payments and a new agreement between TLG and the remaining creditors was made in spring of 1977. However, only three payments were made by TLG and yet another arrangement was necessary. On November 14, 1977, an agreement was reached which presented each creditor with two options: (1) 25 percent of the June 15, 1977, outstanding balance as a final cash settlement or, (2) a five percent note for the full June 15, 1977, balance, principal payments to begin February 1, 1980. As of the date of this trial, petitioner had not elected either option. As modified by the various arrangements and agreements, TLG made payments on its October 31, 1971, debt to petitioner as follows: *169 Year Ending
10-31
Principal
Interest
Total
1972
$139,108.05
$139,108.05
1973
26,082.76
26,082.76
1974
34,587.80
$16,820.49
51,408.29
1975
48,422.94
21,262.40
69,685.34
1976
24,211.46
8,912.85
33,124.31
1977
9,952.47 [3]
Totals
$272,413.01
$46,995.74
$329,361.22
Total principal payments by TLG equal 63 percent of the entire October 31, 1971, unpaid balance, and total payments, including interest, equal 75 percent of that balance. Petitioner has not initiated any judicial proceedings to obtain repayment of the balance outstanding. On its corporate Federal income tax return for FYE October 31, 1971, petitioner deducted $308,601.14 of the TLG account, 71 percent of the unpaid balance of October 31, 1971, as worthless. As president of petitioner, Wright decided on or about October 22, 1971, to deduct 71 percent of the receivable, purportedly based on the fact that petitioner received less than 30 percent of the sale proceeds from the Ben Pearson and Yard-Man sales. Although *170 no bankruptcy proceeding or any other proceeding to liquidate TLG had been initiated as of the date of the trial in this case, Wright feared that some such proceeding would occur, leaving petitioner the same pro rata share of the remaining receivable balance. In his notice of deficiency, respondent disallowed the entire deduction. OPINION Section 166(a)(2) provides that: "When satisfied that a debt is recoverable only in part, the Secretary or his delegate may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction." This section leaves to the discretion of the respondent the determination of whether a taxpayer may deduct a portion of a bad debt as worthless, and the exercise of that discretion is controlling unless it is plainly arbitrary or unreasonable. Wilson Bros. & Co. v. Commissioner,124 F. 2d 606, 609 (C.A. 9, 1941), affirming a Memorandum Opinion of this Court; Stranahan v. Commissioner,42 F. 2d 729 (C.A. 6, 1930), affirming 14 B.T.A. 1405 (1929), certiorari denied *171 283 U.S. 822 (1931); Sika Chemical Corp. v. Commissioner,64 T.C. 856, 863 (1975), affirmed without published opinion 538 F. 2d 320 (C.A. 3, 1976); Findley v. Commissioner,25 T.C. 311, 318 (1955), affirmed per curiam 236 F. 2d 959 (C.A. 3, 1956). While attempting to show that respondent's determination is arbitrary or unreasonable, it is the petitioner's burden to introduce evidence which establishes that the amount of partial worthlessness claimed could be predicted with "reasonable certainty" in the year the deduction was claimed. Wilson Bros. & Co. v. Commissioner,supra; Sika Chemical Corp. v. Commissioner,supra;Trinco Industries,Inc. v. Commissioner,22 T.C. 959, 965 (1954); First National Bank of Los Angeles v. Commissioner,6 B.T.A. 850, 860 (1927). Petitioner has not met this burden. Although TLG was experiencing financial difficulty, as of October 31, 1971, it was not insolvent, as petitioner claims. [4] With the conversion of a part of its insubordinated debt to preferred stock, TLG's *172 net worth was almost $9,000,000. Further, there was no real threat of involuntary bankruptcy or forced liquidation. All of the unsecured creditors were cooperating to achieve maximum repayment of all their accounts with TLG. Any mention by their committee of proceedings to terminate TLG was made only as a reference to something to be avoided. On the contrary, it was the expressed opinion of the creditors' committee, as early as November 17, 1971, that TLG was solvent and capable of meeting its obligations. *173 Nevertheless, if petitioner could have shown that its decision to charge off 71 percent of its receivable with TLG was a wise exercise of business judgment supported by all of the facts available, then respondent's determination would have proven arbitrary and unreasonable. Blair v. Commissioner,91 F. 2d 992, 994 (C.A. 2, 1937), reversing a Memorandum Opinion of this Court; Portland Manufacturing Co. v. Commissioner,56 T.C. 58 (1971), affirmed without published opinion (C.A. 9, April 21, 1975). It must be remembered, however, that while the law does not require the petitioner to be an "incorrigible optimist" in the exercise of its business judgment in this situation, neither will the law allow petitioner to be a "stygian pessimist." United States v. White Dental Manufacturing Co.,274 U.S. 398, 403 (1927); Ruppert v. United States,22 F. Supp. 428, 431 (Ct. Cl. 1938). The decision to charge off 71 percent of the debt of TLG was made on or about October 23, 1971. Petitioner's fiscal year ended on *174 October 31, 1971. On those dates, TLG was experiencing financial difficulty, but remained a solvent, on-going concern. Between October 31, 1971, and January 17, 1972, when petitioner's corporate income tax return was filed, improvements were made in TLG's financial position, including the sales of the Ben Pearson and Yard-Man Divisions in November, the proceeds of which partially paid the unsecured debts of TLG. On May 19, 1972, less than four months after the return claiming the bad debt deduction was filed, petitioner resumed sales to TLG on an open account. Thus, within a six-month period, TLG was regarded by petitioner as both incapable of paying more than 29 percent of its debt and responsible enough to merit credit sales on an open account. Such a turnaround in the financial relationship of TLG and petitioner is incredible, especially since the major improvements in TLG's financial status occurred before January 1972, nearer the date the debt was charged off than the date the open account was restored. Petitioner has failed not only to show support for finding any portion of TLG's debt worthless, but also to explain satisfactorily the reason for the 71 percent figure used. *175 The percentage purportedly was derived from the proportion of proceeds received by petitioner from the sales of Ben Pearson and Yard-Man Divisions. However, the sales, which improved the financial position of TLG, occurred after the decision to charge off the portion of the debt was made. No further details were presented about the establishment of this exacting figure as "reasonably certain" as of October 31, 1971. Overall, it has not been shown that, contrary to respondent's determination, any portion of TLG's debt to petitioner was in Jeopardy of not being repaid. Instead, the debt had both current and potential value as of October 31, 1971. Cf. Dustin v. Commissioner,53 T.C. 491, 501 (1969), affirmed 467 F. 2d 47 (C.A. 9, 1972). The balance sheet of TLG showed sufficient assets to provide a return of much more than 29 percent of its unsecured debts. Further, TLG was an on-going concern being assisted by the creditors' committee to improve its financial status and to continue its operations for the benefit of those creditors. In fact, the promise of improvement by TLG and the committee has been fulfilled, for petitioner has already *176 received over 60 percent of the original debt plus interest. For all of the reasons discussed above, we cannot find respondent's determination plainly arbitrary or unreasonable. To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
1. For FYE October 31, 1971, petitioner conceded respondent's disallowance of a portion of a deduction for travel and entertainment expenses and a deduction of automobile expenses. Therefore, a computation under Rule 155 will be necessary for FYE October 31, 1971, if the issue presented here is decided in petitioner's favor. Petitioner also conceded the entire deficiency determined by respondent for FYE October 31, 1972. However, petitioner included a partial recovery of its claimed bad debt deduction in its income for FYE October 31, 1972. Thus, if respondent's disallowance of the bad debt deduction for FYE October 31, 1971 is sustained, petitioner's income for FYE October 31, 1972 will be decreased by the amount of that partial recovery. A computation under Rule 155 will be necessary for FYE October 31, 1972 in that situation. ↩
2. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the year in issue.↩
3. The figures for the year ending October 31, 1977, were not apportioned between principal and interest before being presented as evidence in this case.↩
4. Even if TLG's liabilities had outweighed its assets, the fact that it was an on-going concern would have precluded a finding of debt worthlessness. See Riss v. Commissioner,56 T.C. 388, 408 (1971) and cases cited there; Trinco Industries, Inc. v. Commissioner,22 T.C. 959 (1954). But cf. Portland Manufacturing Co. v. Commissioner,56 T.C. 58 (1971), affirmed without published opinion (C.A. 9, April 21, 1975) (debtor had no going - concern value); American Processing & Sales Co. v. United States,178 Ct. Cl.353, 371 F. 2d 842↩ (1967) (debtor's business operation almost totally destroyed by fire).